UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00044-TBR

SHAWNDA PACHECO                                                                    Plaintiff

v.

NANCY WALDROP,                                                                  Defendants
individually and in her official capacity as Superintendent of the
McCracken County School System,
*and*
VICTOR ZIMMERMAN,
individually and in his official capacity as Principal of Reidland
High School

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Plaintiff Shawnda Pacheco's Motion for

Temporary Restraining Order.   (Docket No. 3.)   Defendants Nancy Waldrop,

individually and in her official capacity as superintendent of the McCracken County

School System, and Victor Zimmerman, individually and in his official capacity as

principal of Reidland High School, have responded in opposition, (Docket No. 11), and

Pacheco has replied, (Docket No. 15.)  This matter is now ripe for adjudication.  For the

reasons that follow, Pacheco's Motion will be DENIED.

BACKGROUND

This litigation arises out of the termination of Plaintiff Shawnda Pacheco from

her teaching position at Reidland High School (RHS).  Pacheco filed this action on

March 21, 2013, pursuant to 42 U.S.C. § 1983 and the Kentucky Whistleblower Act,

Ky. Rev. Stat. § 61.102 *et seq.*  (*See* Docket No. 1.)  Pacheco alleges that she was wrongfully terminated by Defendant Nancy Waldrop in violation of her First Amendment Right to Free Speech.  Pacheco also alleges that Waldrop and Defendant Victor Zimmerman together violated the Kentucky Whistleblower Act by terminating her employment because of certain statements she made.[1]

Waldrop is the superintendent of the McCracken County School District (District).  At the time of Pacheco's termination, the District was comprised of six elementary schools, three middle schools, and three high schools, among which was RHS.  RHS serves students from Reidland Middle School, which is physically connected to RHS.  Zimmerman was, at the time of Pacheco's termination, the principal of RHS.  Pacheco taught Spanish at RHS for some ten years prior to her termination on January 18, 2013.  RHS had approximately 450 students and, in addition to Zimmerman, had an assistant principal, Jodi Butler, and a District resource officer, Bruce Watson.

Although the parties' specific accounts vary, sometime early in the week of December 10, 2012, Taylor Ballard, another RHS teacher, reported to Watson that two female students in one of his classes had overheard two male students in that same class talking about a bomb and possessing some sort of a map or drawing showing where the bomb might be placed.  Watson took the two male students to Principal Zimmerman's office, where Zimmerman had each separately write a statement about what had

---

[1] Pacheco's instant Motion is premised on the alleged violation of her First Amendment Rights, not her claim brought under the Kentucky Whistleblower Act.  As such, the Court will limit its discussion here to Pacheco's First Amendment claim.

occurred in Ballard's class.  The two students wrote similar statements describing a videogame they had played and explained that they had modeled a location they created in that game on the floor plan of RHS.  Watson researched the videogame and reported to Zimmerman that the videogame did involve building locations where battles could then take place.  Zimmerman and Watson also interviewed the two female students who had initially reported the matter to Ballard.  By the end of that school day, Zimmerman and Watson were satisfied that there was no imminent threat or plan to harm the school or its students, concluding that the two male students had, in fact, been discussing a videogame and that their overheard conversation had been misinterpreted.  Zimmerman thereafter informed Butler of the situation and together they contacted the parents of the students who had been investigated as well as the students who had made the report.

Zimmerman then relayed the incident to Larry Zacharetti, the District's safety director, and Russ Tilford, the District's director of student personnel.  Zimmerman called Waldrop and left a message about the incident, and Tilford conveyed Zimmerman's conclusions to Waldrop.  Tilford agreed with Zimmerman that the two male students had not violated any code of conduct and that no disciplinary action was warranted.  Based on the information she received, Waldrop understood that two male students had been overheard discussing bombs and a map of RHS, which had been investigated as a perceived threat.  It was Waldrop's understanding that the matter had been investigated and determined not to involve an actual threat but merely a misinterpreted discussion of a videogame.  Waldrop considered the matter closed, and no disciplinary action was taken against either of the investigated students.

One of the two male students, whom the parties refer to as "Student 1," was absent the day after the investigated incident but was in attendance later that week on Friday, December 14, 2012.  Notably, December 14 was also the day of the elementary school shooting in Newtown, Connecticut.  That morning, Zimmerman observed Pacheco talking to another teacher, Michael Wood, in the hallway.  Wood told Zimmerman that he had seen a student, whose name Wood did not know, carrying a large bag with something dangerous in it.  Zimmerman subsequently saw Student 1 carrying an oversized bag and, due to Wood's concern, asked Student 1 to come to his office.  Student 1 allowed Zimmerman to search the bag, and Zimmerman determined that the bag contained only school-related items and nothing dangerous.

Later that day, Pacheco met with another RHS student, whom the parties refer to as "Student 2," and asked him to write a letter to the Paducah Sun newspaper telling the newspaper that a student who had twice brought weapons to school had been overheard talking about plotting a bomb attack at RHS and had prepared a map of the school relative to that plot.  Pacheco dictated the letter to Student 2 as he typed it on a RHS laptop computer and then printed the letter on a printer in RHS's library.  Pacheco then asked Student 2 to sign his name to the letter.  Pacheco says she asked Student 2 to sign the letter using his name and phone number because she was "hoping to personally avoid the wrath of Waldrop."  (Docket No. 3-1, at 8.)  Pacheco mailed the letter to the Paducah Sun the next day, Saturday, December 15.  That letter stated, in its entirety:

> Dear sir,
>     As a student at Reidland High School, I see fights dealt with promptly, tobacco abuse punished according to school regulations, and even profanity is dealt with promptly. But we have a student,

someone who sits in class with us, who has brought weapons twice and most recently plotted a map of bomb and gun attack sites around the school area. The student has yet to be punished for anything. Is it that Doctor Waldrop, the Superintendent, is afraid to enforce school rules? Is he being protected because of some minority status? Although he's not a minority. Is he special ed? Regardless the rest of us sit in class with him knowing he's dangerous. What would you do Mr. Editor?

(Docket No. 1-1.)

The letter reached the Paducah Sun on Monday, December 17. That evening, Waldrop was contacted by Zacharetti, who informed her that the McCracken County Sheriff's office had been contacted by the Paducah Sun after having received a letter containing a serious threat regarding RHS. Later that evening, Waldrop met with Zacharetti, several law enforcement representatives, the attorney for the District, and the Commonwealth Attorney. The Paducah Sun had released the content of the letter to law enforcement but initially refused to release the name and contact information for the letter's author. The sheriff's department informed Waldrop that without the author's name, they were unable to conduct a complete investigation of the threat referenced in the letter. Based on Waldrop's meeting with law enforcement, the decision was made to close RHS the following day, December 18. Because it is physically connected to RHS, Reidland Middle School was also closed December 18.

Law enforcement conducted a search for weapons at RHS while the school was closed on December 18 and ultimately determined the building to be safe. Also on December 18, law enforcement obtained the name of the letter's author. After completing their investigation, law enforcement met with Zimmerman that evening and

advised him that there was no threat and that the letter related to the videogame incident the week before.  Also during that meeting, Captain Matt Carter of the sheriff's department informed Zimmerman that the letter had been written by Student 2 at Pacheco's direction and that Pacheco had subsequently mailed the letter.

RHS and Reidland Middle School resumed classes the next day, December 19. December 18 and 19 were originally scheduled for final exams, with the holiday break beginning on December 20.  Due to the closure, final exams scheduled for December 18 were administered when the school resumed classes in January, and RHS and Reidland Middle School held a makeup day on Presidents' Day, February 18.  (Other District schools did not hold classes on Presidents' Day.)  When classes resumed on December 19, Zimmerman distributed to the RHS staff a copy of the letter to the editor and a press release from the McCracken County Sheriff's office regarding the incident. Zimmerman also read that information over the intercom to address the students' and faculty's concerns.  Jon Hedges, the teacher whose class Student 1 was in when Zimmerman read that information, reported to Zimmerman that other students were looking at Student 1 and talking about him.  Hedges was reportedly concerned about Student 1 being bullied and asked Zimmerman how he should respond.

Waldrop thereafter asked the assistant superintendent, Johnna DeJarnett, to investigate the circumstances surrounding the letter.  DeJarnett arranged for interviews of RHS personnel, and Zimmerman arranged for an interview of Student 2, the student who had signed the letter to the editor.  During his interview, Student 2 reported being asked by Pacheco to write the letter to the editor.  Student 2 indicated he did not know

who the student was that Pacheco was concerned about and had not heard rumors about bombs or a map of the school.  Student 2 told Zimmerman that he felt he should write the letter for Pacheco because Pacheco was a teacher whom he respected.  Prior to the District taking any disciplinary action against Pacheco, Waldrop also conducted her own interview of Pacheco.  Based on that interview, Waldrop made a number of findings, which are detailed in her affidavit, (*see* Docket No. 11-1, at ¶ 14), and ultimately decided to terminate Pacheco on the bases of insubordination and conduct unbecoming a teacher.  Regarding the latter, Waldrop found that Pacheco's conduct violated a number of school board policies and Kentucky statutes and regulations, including:

- *16 Ky. Admin. Reg. 1:020*, which provides, with respect to students, that school personnel have the obligation to "take reasonable measures to protect the health, safety, and emotional well-being of students"; "not use professional relationships or authority with students for personal advantage"; "keep in confidence information about students which has been obtained in the course of professional service, unless disclosure serves professional purposes or is required by law"; "not knowingly make false or malicious statements about students or colleagues"; and "refrain from subjecting students to embarrassment or disparagement."
- *Ky. Rev. Stat. § 160.720*, which provides, with certain exceptions, that it is impermissible to release or disclose records, reports or identifiable information on students to third parties.
- *Board Policy 03.1325*, which provides that any employee engaging in behavior which disrupts the educational process (defined to include conduct "that disrupts delivery of instructional services or interferes with the orderly administration of the school and school-related activities or District operations") may be subject to disciplinary action, including termination of contract.
- *Board Policy 08.2323*, which requires that employees use electronic mail and other District technology resources "for purposes directly related to work-related activities" and provides

that violations subject personnel to disciplinary action, up to and including termination.

- *Board Policy 03.14*, which requires employees to "report any conditions they believe to be unsafe to their immediate supervisor."
- *Board Policy 03.133*, which specifies that employees are expected to use sound judgment in the performance of their duties and to take reasonable measures to protect the health, safety, and well-being of others, as well as District property.
- Pacheco's acknowledged obligation to immediately report any threat or warning signs to supervisors, law enforcement or 911.

(Docket No. 11-1, at ¶ 16.)

By letter of January 18, 2013, Waldrop terminated Pacheco and explained the reasons for her termination.  (*See* Docket No. 1-2.)  Pacheco initially exercised her right, pursuant to Ky. Rev. Stat. § 161.790, to appeal her termination.  A tribunal hearing was scheduled for February 28, 2013 before a three-member panel appointed by the Kentucky Department of Education, and a prehearing conference was scheduled for February 6.  Prior to that prehearing conference, Pacheco filed suit in this Court against Waldrop and Zimmerman asserting a claim under § 1983 and also alleging that Waldrop and Zimmerman conspired to deprive her of due process of law.  *See Pacheco v. Waldrop et al.*, No. 5:13-CV-00016-TBR, Docket No. 1.  Then on February 8, Pacheco moved to dismiss that lawsuit without prejudice, *id.*, Docket No. 9, and the Court granted her motion that same day.  *Id.*, Docket No. 10.  On February 15, Pacheco withdrew her request for an administrative hearing to appeal her termination.  The instant action was then filed on March 21, 2013.  (*See* Docket No. 1.)

STANDARD

Although the instant Motion before the Court is styled as one seeking a temporary restraining order, the parties agreed to a briefing schedule, (*see* Docket No. 8), and Defendants have been afforded an opportunity to respond, (*see* Docket No. 11). As such, the Court will treat Pacheco's Motion as one seeking a preliminary injunction. *See* Fed. R. Civ. P. 65(a), (b); *see also Ky. ex rel. Cabinet for Workforce Dev. Ky. Dep't for the Blind v. U.S. ex rel. Panetta*, 2012 WL 5289659, at *3 n.6 (W.D. Ky. Oct. 23, 2012) (treating a motion for temporary restraining order as one for a preliminary injunction where the defendant had been afforded an opportunity to respond).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Accordingly, "[t]he granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court." *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 260–61 (6th Cir. 1977).

> In determining whether to issue a preliminary injunction, the district court is required to consider four factors: (1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction; (3) whether a preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would be in the public interest.

*Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). "These factors are not prerequisites that must be met, but are interrelated considerations

that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

Although no single factor is controlling when determining whether a preliminary injunction should issue, the likelihood of success on the merits is often the predominant consideration. *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal."); *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("[W]hile, as a general matter, none of [the] four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed."). With respect to this first element—a showing of a strong likelihood of success on the merits—the Sixth Circuit advises that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.").

Furthermore, "[d]espite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982). To establish immediate and irreparable harm there must be an actual, viable, presently existing threat of serious harm. *Cabinet for Workforce Dev.*, 2012 WL 5289659, at *3

(citing *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Mass.*, 649 F.2d 71, 74 (1st Cir. 1981)). A plaintiff must show injury that is not remote or speculative, but is actual and imminent. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Abney*, 443 F.3d at 552. The injury must be of such imminence that there is a clear and immediate need for relief in order to prevent harm. *Evans v. Wilson*, 2011 WL 5509543, at *2 (W.D. Ky. Nov. 10, 2011) (citing *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).

DISCUSSION

The Court has closely scrutinized the parties' respective briefs and the affidavits submitted with those briefs, and has concluded that a hearing is not necessary to properly adjudicate the instant Motion before the Court. The Court discussed this issue with the parties on May 15, 2013, and the parties are in agreement that no additional evidence need be produced. On May 17, 2013, the Court entered an Order submitting this matter to the Court for decision. Accordingly, the Court now will proceed to address whether Pacheco has carried her burden of demonstrating that injunctive relief is in order.

**I.     Whether Pacheco is Likely To Succeed on the Merits**

The first factor the Court must consider is Pacheco's likelihood of success on the merits of her First Amendment claim. In an action brought under § 1983, a plaintiff must demonstrate the deprivation of a right secured by the Constitution or laws of the United States that was caused by a person acting under color of law. *See Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) (citing *West v. Atkins*, 487 U.S. 42, 48

(1988)).  To establish a prima facie case for her First Amendment retaliation claim, Pacheco must show three things:  (1) that she engaged in constitutionally protected speech, (2) that she suffered an adverse employment action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) that the adverse action was motivated at least in part by her protected speech.[2]  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)), *reh'g and reh'g en banc denied*, (6th Cir. Mar. 19, 2013); *see also Thaddeus–X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc).  If the plaintiff can establish each of these three elements, then the burden shifts to the defendant to show that "he would have taken the same action in the absence of the protected activity."  *Thaddeus–X*, 175 F.3d at 399.  However, "[u]nlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims."  *Dye*, 702 F.3d at 295.

The first element of Pacheco's prima facie First Amendment retaliation claim—whether she engaged in constitutionally protected speech—requires several

---

[2] Interestingly, in regard to the third element, there appear to be two parallel approaches to the standard for First Amendment retaliation claims in this Circuit.  One approach frames the third element as requiring that the adverse action "was motivated at least in part" by the claimant's protected speech.  This approach was adopted by the Sixth Circuit *en banc* in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  And in 2012, this language was used by the Sixth Circuit in at least four decisions.  *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012); *Buchko v. Cnty. of Monroe*, No. 10-2476, 2012 WL 5896550, at *4 (6th Cir. Nov. 21, 2012); *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012); *Akers v. Cnty. of Bell*, 498 F. App'x 483, 486 (6th Cir. 2012).  A second approach, which was also used in several decisions last year, frames the third element as requiring that protected speech be a "substantial or motivating factor" in the employer's decision to take adverse action against the employee.  *See Upton v. City of Royal Oak*, 492 F. App'x 492, 498 (6th Cir. 2012); *Kiessel v. Oltersdorf*, 459 F. App'x 510, 513 (6th Cir. 2012).  This approach appears to be founded on the language used by the Supreme Court in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Finally, at least one decision last year employed both "motivated at least in part by" *and* "substantial or motivating factor."  *See Webb v. Ky. State Univ.*, 468 F. App'x 515, 522-23 (6th Cir. 2012).  In practice, there may not be a functional difference between the two; however, for purposes of this Opinion, the Court will follow the *en banc* Sixth Circuit's language in *Thaddeus-X*, which also seems to be the prevailing approach.

considerations.  In *Garcetti v. Ceballos*, the Supreme Court recognized that citizens who enter government service "must accept certain limitations on [their] freedoms," including limitations on the scope of their First Amendment rights.  547 U.S. 410, 418 (2006).  Observing that public employees "do not surrender all their First Amendment rights by reason of their employment," the Supreme Court held that the interest of a public employee "in commenting on matters of public concern" must be balanced against the interest of governmental employers "in promoting the efficiency of the public services it performs through its employees."  *Id.* at 417.  Thus, for a public employee's statements to receive First Amendment protection, the public employee must (1) speak as a citizen, (2) address matters of public concern, and (3) the employee's interest as a citizen in speaking on the matter must outweigh the state's interest, as an employer, in "promoting the efficiency of the public services it performs through its employees."  *Handy-Clay*, 695 F.3d at 540 (quoting *Garcetti*, 547 U.S. at 417-18); *see also Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).

### 1.      Speaking as a private citizen

In *Garcetti*, the Supreme Court clarified what it means for a public employee to speak as a private citizen for purposes of the First Amendment, stating that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421.  Thus, "even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties."  *Weisbarth,* 499 F.3d at 545.  The question whether a statement was spoken as a public employee or as a private citizen for First

Amendment purposes, according to the Supreme Court, is "a practical one," which requires a fact-specific inquiry into the "duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424-25. Several factors relevant to this determination include: (1) the employee's duties, (2) the impetus for the speech, (3) the setting of the speech, (4) the speech's audience, and (5) the subject matter of the speech. *See Handy-Clay*, 695 F.3d at 540; *Weisbarth*, 499 F.3d at 546.

Pacheco insists she was speaking as a private citizen rather than as a part of her official duties as a teacher at RHS. She reasons that her comments were not made in her capacity as a teacher pursuant to her official duties and were made to the newspaper addressing a matter of public concern. She further insists that her comments were motivated in part by the fact that she had two children who attended RHS for whose safety she was concerned.

In applying the factors laid out in *Handy-Clay*, the Court finds, for purposes of this Opinion, that Pacheco's speech was made a private citizen. The Court reads the letter to the editor, in effect, as complaining that no disciplinary action has been taken against an RHS student despite his having twice brought weapons to school and plotted a map of bomb and gun attack sites around the school. The letter was addressed to, and published by, the local newspaper, and the message it conveys is that school officials have failed to take appropriate action against a student who poses a dangerous threat. Pacheco's duties as a teacher, pursuant to express Board Policy, included reporting any conditions believed to be unsafe to her immediate supervisor, taking reasonable measures to protect the health and safety of others and of District property. Pacheco also acknowledged that she had an obligation to report any immediate threats to her

supervisors or to law enforcement.  Thus, to the extent it was Pacheco's official duty to report any perceived threat either up the chain of command or to the appropriate authorities, this she did not do.  Instead, she went outside the chain of command and expressed an opinion in a public forum.  Accordingly, for purposes of this Opinion, the Court will assume that these considerations weigh in favor of finding that Pacheco's speech was made as a private citizen rather than a public employee.

### 2.    Matter of public concern

Whether a public employee's speech addresses a matter of public concern is determined by the content, form, and context of that speech.  *See Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Speech usually addresses a matter of public concern when it relates to matters of political, social, or other concern to the community as opposed to matters of personal interest to the employee.  *See id.* at 146-47.  Still, courts must look beyond the general topic of the speech because, as another circuit court put it, the speech must "not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government.'"  *Schrier*, 427 F.3d at 1263.  Moreover, speech that is knowingly or recklessly false is not a matter of public concern.  *Westmoreland*, 662 F.3d at 720-21 (discussing *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007)).  In this regard, "[a] public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment"; instead, "it is the defendants' burden to establish that [plaintiff] knew or was recklessly indifferent to the fact that his speech was false." *Id.* (alterations in original) (quoting *Chappel v. Montgomery Cnty. Fire Prot.*, 131 F.3d 564, 576 (6th Cir. 1997)).

Pacheco argues that her statements involved a matter of public concern because "nothing could be more important to community interests than safety and welfare of its children." (Docket No. 3-1, at 16.) To this end, she reasons that "it is difficult to imagine a case that is stronger on the issue of 'public concern.'" (Docket No. 3-1, at 16.) With this much, the Court agrees. However, the crux of Pacheco's speech was that a student "plotted a map of bomb and gun attack sites around the school area [but] has yet to be punished for anything," and, thus, posed a danger that is a matter of public concern. (Docket No. 1-1.) On this point, Defendants have come forward with evidence in the form of Waldrop's and Zimmerman's affidavits showing that the factual predicate underlying Pacheco's statement was false—that is, that there was no plot to bomb the school and no real safety risk to RHS or its students. These affidavits show that Pacheco had no personal knowledge of any plot, that Pacheco was not involved in the investigation of Student 1, and that Pacheco had no knowledge of the outcome of that investigation. Instead, the evidence suggests that she simply assumed the plot was real and that RHS administration had done nothing about it. Defendants argue that Pacheco could have sought additional information and obtained the truth but did not. This, they urge, demonstrates a reckless indifference to the truth of her assertions.

Whether Pacheco's statements in the letter to the editor were made with reckless indifference likely presents a question of fact and, even if not, need not be decided as a matter of law at this juncture. Nevertheless, the Court acknowledges that Defendants have produced some evidence tending to show that Pacheco's statements could be recklessly indifferent to the truth such that those statements would fall outside the protection of the First Amendment. This evidence, to the extent it has an effect on the

resolution of Pacheco's instant Motion for injunctive relief, raises a factual dispute that, if anything, cuts against Pacheco's showing that she is likely to prevail on the merits of her First Amendment claim.

### 3.    *Pickering*'s Balancing Test

Assuming that Pacheco can demonstrate that she was speaking as a private citizen about a matter of public concern, the Court will proceed to the third step of determining whether her speech was constitutionally protected.  At this step, the Court must decide whether Pacheco's First Amendment interests outweigh her employers' interests in promoting the efficiency of the public services performed by RHS.  *See, e.g.*, *City of Elyria*, 502 F.3d at 492 (applying *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968)).  The Sixth Circuit outlines several factors relevant to this analysis, including whether the speech: (1) relates to an issue of public concern, (2) was likely to foment controversy and disruption, (3) impeded the department's general performance and operation, (4) affected the loyalty and confidence necessary to the department's proper functioning, (5) was false and the employer could not have easily rebutted or corrected the errors, (6) was directed toward a person whom the speaker normally contacted during the course of work, and (7) was truthful.  *See id.* (discussing *Soloman v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988); *Pickering*, 391 U.S. at 569-70).

In balancing the interests here, the Court finds that the Defendants' interest in promoting the efficiency of the services provided by RHS outweighs Pacheco's First Amendment right to comment publicly on her concerns.  First, even assuming her statements were not made with knowing or reckless disregard for the truth, they were

ultimately false insofar as there was never any actual plot to bomb the school.  At this point in the Court's analysis, it is irrelevant whether Pacheco actually believed her statements to be true.  *See City of Elyria*, 502 F.3d at 493-94.  Second, although Pacheco insists that her statements were not meant to foment controversy or disruption, the facts remain that she mailed the letter the next day after the Newtown, Connecticut, school shooting and that the letter did cause significant disruption.  Third, Defendants have presented evidence that attendance the day school reopened on December 19 was roughly 10% lower than their typical attendance rate.  While this drop in attendance may be attributable to other factors (such as the impending holiday break), it also implies that Pacheco's statements affected the confidence of students and their parents in RHS's efforts to provide a safe school environment.  Fourth, Pacheco's erroneous fear that a student was plotting a bomb attack easily could have been dispelled.  She states that she "approached Assistant Principal Jodi Butler and inquired as to what discipline had been imposed [and] was informed that the matter was given to [Waldrop and Zimmerman]."  (Docket No. 15, at 11.)  However, Pacheco did not approach either Waldrop or Zimmerman and inquire further, nor did she approach Watson, who had been part of investigating the threat in the first instance.  Fifth, and perhaps most importantly, Pacheco's speech significantly impeded the performance and operation of both RHS and Reidland Middle School in that both schools shut down due to the threat conveyed by Pacheco's letter.  Final exams had to be rescheduled after the holiday break, and the schools had to make up the missed day on a holiday when other District schools were closed.  All in all, some 900 students and their families were affected by the closures.

With these factors in mind, the Court cannot conclude that Pacheco's First Amendment right to express publicly her concerns outweighs the interests of the Defendants in promoting the efficiency of the educational services provided by RHS and other District schools.  Therefore, the Court finds that, at this stage in the litigation, Pacheco has not established the first element of a prima facie First Amendment retaliation claim—*i.e.*, that she engaged in constitutionally protected speech.  As such, the Court need not address the second and third elements of a prima facie claim, or whether Defendants have met their burden of showing that the same adverse action would have been taken in the absence of the protected activity.

* * *

Accordingly, the Court finds that for purposes of her instant Motion, Pacheco has not shown a strong likelihood of success on the merits.  Pacheco has not altogether failed to show any possibility of success, and genuine factual issues appear to remain yet unresolved.  However, as noted above, the Sixth Circuit advises that, relative to a showing of likelihood of success on the merits, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d 739.  Perhaps further discovery could alter this analysis; however, at this preliminary stage, Pacheco has not met this burden.  For these reasons, the Court finds that the first factor of consideration whether to grant Pacheco the injunctive relief she seeks weighs against her and in favor of Defendants.

## II.      Whether Pacheco Will Suffer Immediate and Irreparable Injury

Pacheco argues that she will suffer immediate and irreparable injury if she is not immediately reinstated.  She argues that "the Court cannot grant complete relief to the plaintiff or in fact any relief to the plaintiff for the time she misses work," reasoning that "[t]he time she misses is lost forever."  (Docket No. 3-1, at 14-15.)  Defendants respond, arguing that Pacheco has not been working as a teacher at RHS since her termination in January and stating that her students have long since adjusted to a new teacher.  Defendants also argue that there is no evidence that Pacheco's being unable to teach in the District during this litigation will cause any irreparable harm.

The Court finds Pacheco's argument here unpersuasive and the single authority she references, *Hudson v. Barr*, 3 F.3d 970 (6th Cir. 1993), inapposite to this case.  The Sixth Circuit has held that a preliminary injunction is not necessary where a plaintiff had not shown a substantial likelihood of succeeding on his First Amendment claim and where his injuries were primarily economic in nature.  *See Bonnell v. Lorenzo*, 241 F.3d 800, 825 (6th Cir. 2001).  Based on the Court's foregoing analysis above in Part I, the Court does not believe that Pacheco has shown a substantial likelihood of succeeding on the merits of her First Amendment claim.  The Court further finds that the injuries Pacheco claims are primarily, if not entirely, economic in nature.  Should Plaintiff ultimately prevail on her claims, the Court finds no reason why her injuries would not be properly compensable by monetary damages.

**III.     Whether Issuance of an Injunction Would Cause Harm to Others and Whether the Public Interest Would be Served**

On these third and fourth factors, Pacheco summarily argues that because she has been teaching for 10 years and has never been the subject of disciplinary action, should the Court grant the injunctive relief she seeks, allowing her to continue to teach would pose no threat to the school or the public. Regardless whether these factors weigh in Pacheco's favor, the Court finds the factors discussed above in Parts I and II dispositive as to the overarching issue of whether injunctive relief is warranted.

CONCLUSION AND ORDER

For the foregoing reasons, and upon considering the four factors outlined in *Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006), the Court finds that Pacheco has not carried her burden of proving that the circumstances here demand injunctive relief. *See Overstreet*, 305 F.3d at 573. Therefore, the Court will decline to issue a preliminary injunction as Pacheco requests. Accordingly, having considered the Plaintiff's instant Motion and being otherwise sufficiently advised;

IT IS HEREBY ORDERED that Plaintiff Shawnda Pacheco's Motion for Temporary Restraining Order, (Docket No. 3), which the Court has treated as a motion for preliminary injunction, is DENIED.

IT IS SO ORDERED.

Date:

cc:        Counsel