UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00044-TBR

SHAWNDA PACHECO                                                                                    Plaintiff

v.

NANCY WALDROP,                                                                                   Defendants
individually and in her official capacity as Superintendent
of the McCracken County School System,

and

VICTOR ZIMMERMAN,
individually and in his official capacity as Principal
of Reidland High School

### MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' motion for summary judgment. (Docket #24). Plaintiff has responded. (Docket #28). Defendants have replied. (Docket #31). This matter is now ripe for adjudication. For the following reasons, the Defendants' motion for summary judgment (Docket #24) is GRANTED IN PART and DENIED IN PART.

### BACKGROUND

This litigation arises out of the termination of Plaintiff Shawnda Pacheco from her teaching position at Reidland High School. Pacheco filed this action on March 21, 2013, pursuant to 42 U.S.C. § 1983 and the Kentucky Whistleblower Act, Ky. Rev. Stat. § 61.102 *et seq*. (Docket #1). Pacheco alleges that she was wrongfully terminated by Defendant Nancy Waldrop in violation of her First Amendment Right to Free Speech. Pacheco also alleges that Waldrop and Defendant Victor Zimmerman violated the Kentucky Whistleblower Act by terminating her employment because of certain statements she made.

1

Pacheco taught Spanish at Reidland High School ("RHS") for ten years prior to her termination on January 18, 2013. Waldrop is the superintendent of the McCracken County School District ("District"). At the time of Pacheco's termination, the District was comprised of six elementary schools, three middle schools, and three high schools, among which was RHS. RHS serves students from Reidland Middle School, which is physically connected to RHS. Zimmerman was, at the time of Pacheco's termination, the principal of RHS. In addition, RHS had an assistant principal, Jodi Butler, and a District resource officer, Bruce Watson. RHS had approximately 450 students at the time of this incident.

Although the parties' specific accounts vary, sometime early in the week of December 10, 2012, Taylor Ballard, another RHS teacher, reported to Watson that two female students in one of his classes had overheard two male students in that same class talking about a bomb and possessing some sort of a map or drawing showing where the bomb might be placed. Watson took the two male students to Principal Zimmerman's office, where Zimmerman had each student separately write a statement about what had occurred in Ballard's class. The two students wrote similar statements describing a videogame they had played and explained that they had modeled a location they created in that game on the floor plan of RHS. Watson researched the videogame and reported to Zimmerman that the videogame did involve building locations where battles could then take place. Zimmerman and Watson also interviewed the two female students who had initially reported the matter to Ballard. By the end of that school day, Zimmerman and Watson were satisfied that there was no imminent threat or plan to harm the school or its students, concluding that the two male students had, in fact, been discussing a videogame and that their overheard conversation had been misinterpreted. Zimmerman

2

thereafter informed Butler of the situation and together they contacted the parents of the students who had been investigated as well as the students who had made the report.

Zimmerman then relayed the incident to Larry Zacharetti, the District's safety director, and Russ Tilford, the District's director of student personnel. Zimmerman called Waldrop and left a message about the incident, and Tilford conveyed Zimmerman's conclusions to Waldrop. Tilford agreed with Zimmerman that the two male students had not violated any code of conduct and that no disciplinary action was warranted. Based on the information she received, Waldrop understood that two male students had been overheard discussing bombs and a map of RHS, which had been investigated as a perceived threat. It was Waldrop's understanding that the matter had been investigated and determined not to involve an actual threat but merely a misinterpreted discussion of a videogame. Waldrop considered the matter closed, and no disciplinary action was taken against either of the investigated students.

One of the two male students, whom the parties refer to as "Student 1," was absent the day after the investigated incident but was in attendance later that week on Friday, December 14, 2012. Notably, December 14 was also the day of the elementary school shooting in Newtown, Connecticut. That morning, Zimmerman observed Pacheco talking to another teacher, Michael Wood, in the hallway. Wood told Zimmerman that he had seen a student, whose name Wood did not know, carrying a large bag with something dangerous in it. Zimmerman subsequently saw Student 1 carrying an oversized bag and, due to Wood's concern, asked Student 1 to come to his office. Student 1 allowed Zimmerman to search the bag, and Zimmerman determined that the bag contained only school-related items and nothing dangerous.

Later that day, Pacheco met with another RHS student, whom the parties refer to as "Student 2," and asked him to write a letter to the Paducah Sun newspaper telling the newspaper

3

that a student who had twice brought weapons to school had been overheard talking about plotting a bomb attack at RHS and had prepared a map of the school relative to that plot. Pacheco dictated the letter to Student 2 as he typed it on a RHS laptop computer and then printed the letter on a printer in RHS's library. Pacheco then asked Student 2 to sign his name to the letter. Pacheco says she asked Student 2 to sign the letter using his name and phone number because she was "hoping to personally avoid the wrath of Waldrop." (Docket #3, Ex. 1, p. 8). Pacheco mailed the letter to the Paducah Sun the next day, Saturday, December 15. That letter stated, in its entirety:

> Dear sir,
>
> As a student at Reidland High School, I see fights dealt with promptly, tobacco abuse punished according to school regulations, and even profanity is dealt with promptly. But we have a student, someone who sits in class with us, who has brought weapons twice and most recently plotted a map of bomb and gun attack sites around the school area. The student has yet to be punished for anything. Is it that Doctor Waldrop, the Superintendent, is afraid to enforce school rules? Is he being protected because of some minority status? Although he's not a minority. Is he special ed? Regardless the rest of us sit in class with him knowing he's dangerous. What would you do Mr. Editor? (Docket #1, Ex. 1).

The letter reached the Paducah Sun on Monday, December 17. That evening, Waldrop was contacted by Zacharetti, who informed her that the McCracken County Sheriff's office had been contacted by the Paducah Sun after having received a letter containing a serious threat regarding RHS. Later that evening, Waldrop met with Zacharetti, several law enforcement representatives, the attorney for the District, and the Commonwealth Attorney. The Paducah Sun had released the content of the letter to law enforcement but initially refused to release the name and contact information for the letter's author. The sheriff's department informed Waldrop that without the author's name, they were unable to conduct a complete investigation of the threat referenced in the letter. Based on Waldrop's meeting with law enforcement, the decision was

made to close RHS the following day, December 18. Because it is physically connected to RHS, Reidland Middle School was also closed December 18.

Law enforcement conducted a search for weapons at RHS while the school was closed on December 18 and ultimately determined the building to be safe. Also on December 18, law enforcement obtained the name of the letter's author. After completing their investigation, law enforcement met with Zimmerman that evening and advised him that there was no threat and that the letter related to the videogame incident the week before. Also during that meeting, Captain Matt Carter of the sheriff's department informed Zimmerman that the letter had been written by Student 2 at Pacheco's direction and that Pacheco had subsequently mailed the letter.

RHS and Reidland Middle School resumed classes the next day, December 19. December 18 and 19 were originally scheduled for final exams, with the holiday break beginning on December 20. Due to the closure, final exams scheduled for December 18 were administered when the school resumed classes in January, and RHS and Reidland Middle School held a makeup day on Presidents' Day, February 18 (other District schools did not hold classes on Presidents' Day). When classes resumed on December 19, Zimmerman distributed to the RHS staff a copy of the letter to the editor and a press release from the McCracken County Sheriff's office regarding the incident. Zimmerman also read that information over the intercom to address the students' and faculty's concerns. Jon Hedges, the teacher whose class Student 1 was in when Zimmerman read that information, reported to Zimmerman that other students were looking at Student 1 and talking about him. Hedges was reportedly concerned about Student 1 being bullied and asked Zimmerman how he should respond. Waldrop thereafter asked the assistant superintendent, Johnna DeJarnett, to investigate the circumstances surrounding the letter. DeJarnett arranged for interviews of RHS personnel, and Zimmerman arranged for an

5

interview of Student 2, the student who had signed the letter to the editor. During his interview, Student 2 reported being asked by Pacheco to write the letter to the editor. Student 2 indicated he did not know who the student was that Pacheco was concerned about and had not heard rumors about bombs or a map of the school. Student 2 told Zimmerman that he felt he should write the letter for Pacheco because Pacheco was a teacher whom he respected. Prior to the District taking any disciplinary action against Pacheco, Waldrop also conducted her own interview of Pacheco. Based on that interview, Waldrop made a number of findings, which are detailed in her affidavit, (see Docket # 11, Ex. 1, ¶ 14), and ultimately decided to terminate Pacheco on the bases of insubordination and conduct unbecoming a teacher. Regarding the latter, Waldrop found that Pacheco's conduct violated a number of school board policies and Kentucky statutes and regulations, including:

- *16 Ky. Admin. Reg. 1:020*, which provides, with respect to students, that school personnel have the obligation to "take reasonable measures to protect the health, safety, and emotional well-being of students"; "not use professional relationships or authority with students for personal advantage"; "keep in confidence information about students which has been obtained in the course of professional service, unless disclosure serves professional purposes or is required by law"; "not knowingly make false or malicious statements about students or colleagues"; and "refrain from subjecting students to embarrassment or disparagement."

- Ky. Rev. Stat. § 160.720, which provides, with certain exceptions, that it is impermissible to release or disclose records, reports or identifiable information on students to third parties.

- Board Policy 03.1325, which provides that any employee engaging in behavior which disrupts the educational process (defined to include conduct "that disrupts delivery of instructional services or interferes with the orderly administration of the school and school-related activities or District operations") may be subject to disciplinary action, including termination of contract.

- Board Policy 08.2323, which requires that employees use electronic mail and other District technology resources "for purposes directly related to work-related activities" and provides that violations subject personnel to disciplinary action, up to and including termination.

- Board Policy 03.14, which requires employees to "report any conditions they believe to be unsafe to their immediate supervisor."

- Board Policy 03.133, which specifies that employees are expected to use sound judgment in the performance of their duties and to take reasonable measures to protect the health, safety, and well-being of others, as well as District property.

- Pacheco's acknowledged obligation to immediately report any threat or warning signs to supervisors, law enforcement or 911. (Docket # 11, Ex 1).

By letter of January 18, 2013, Waldrop terminated Pacheco and explained the reasons for her termination. (See Docket #1, Ex. 2). Pacheco initially exercised her right, pursuant to Ky. Rev. Stat. § 161.790, to appeal her termination. A tribunal hearing was scheduled for February 28, 2013 before a three-member panel appointed by the Kentucky Department of Education, and a prehearing conference was scheduled for February 6. Prior to that prehearing conference, Pacheco filed suit in this Court against Waldrop and Zimmerman asserting a claim under § 1983 and also alleging that Waldrop and Zimmerman conspired to deprive her of due process of law. *See Pacheco v. Waldrop et al.*, No. 5:13-CV-00016-TBR, (Docket #1). On February 8, Pacheco moved to dismiss that lawsuit without prejudice, *id.*, (Docket #9), and the Court granted her motion that same day. *Id.*, (Docket #10). On February 15, Pacheco withdrew her request for an administrative hearing to appeal her termination. This case was filed on March 21, 2013. (Docket #1).

## STANDARD

Summary judgment is proper if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence. To support this position, he must present evidence on which the trier of fact could find for the plaintiff. *See id.* (*citing Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Pacheo alleges the Defendants violated her First Amendment Right to Free Speech and the Kentucky Whistleblower Act. KRS 61.102 *et seq*. Pacheo's First Amendment claim fails because she did not engage in constitutionally protected speech. Pacheo has raised a factual dispute as to whether the Defendants violated the Kentucky Whistleblower Act. However, to the extent Pacheo claims the Defendants violated the Whistleblower Act in their individual capacity, the Defendants are entitled to summary judgment because the Whistleblower Act does not provide for individual liability.

### I.     **First Amendment Claim.**

To establish a claim for First Amendment retaliation, Pacheo must show:  she engaged in constitutionally protected speech; she suffered an adverse employment action likely to chill a person of ordinary firmness from continuing to engage in protected speech; and the adverse

action was motivated at least in part by her protected speech.[1]  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (*citing Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)), *reh'g and reh'g en banc denied*, (6th Cir. Mar. 19, 2013); *see also Thaddeus–X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc).  If the plaintiff can establish each of these three elements, then the burden shifts to the defendant to show that "he would have taken the same action in the absence of the protected activity." *Thaddeus–X*, 175 F.3d at 399.

For an employee to engage in constitutionally protected speech, she must (1) speak as a citizen, (2) address matters of public concern, and (3) the employee's interest as a citizen in speaking on the matter must outweigh the state's interest, as an employer, in "promoting the efficiency of the public services it performs through its employees." *Handy-Clay*, 695 F.3d at 540 (*quoting Garcetti*, 547 U.S. at 417-18); *see also Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).

### 1.  Speak as a citizen.

The inquiry into whether an employee spoke as a private citizen or as public employee is a "practical one." *Garcetti*, 547 U.S. at 424.  Several factors relevant to this determination include: (1) the employee's duties, (2) the impetus for the speech, (3) the setting of the speech,

---

[1] In regard to the third element, there are two approaches used in this Circuit.  One approach requires the adverse action to be "motivated at least in part" by the claimant's protected speech.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).  The second requires the protected speech be a "substantial or motivating factor" in the employer's decision to take adverse action.  *Upton v. City of Royal Oak*, 492 F. App'x 492, 498 (6th Cir. 2012); *Kiessel v. Oltersdorf*, 459 F. App'x 510, 513 (6th Cir. 2012).  In practice, there may not be a functional difference between the two.  *See e.g. Webb v. Ky. State Univ.*, 468 F. App'x 515, 522-23 (6th Cir. 2012).

(4) the speech's audience, and (5) the subject matter of the speech. *See Handy-Clay*, 695 F.3d at 540; *Weisbarth*, 499 F.3d at 546.

This Court previously found that Pacheo was speaking as a private citizen rather than a public employee. (Docket #19). Pacheo was not speaking as part of her official duties, which required Pacheo to report unsafe conditions to her supervisor. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (2007) ("even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties"). The speech was in a public forum as a letter to the editor of the Paducah Sun, which in effect would reach the general populace. While the speech concerned Waldrop's decision not to discipline a student, it also strongly implicated a threat to the student body at large. For these reasons, the Court concludes Pacheco's speech was made as a private citizen rather than a public employee.

### 2. Matter of public concern.

Speech involves a matter of public concern when it involves "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 147 (1983). There is no debate that a potential bomb threat to a school is a matter of public concern. *Chappel v. Montgomery Cnty. Fire Prot.*, 131 F.3d 564, 576 (6th Cir. 1997) ("Speech on matters directly affecting the health and safety of the public is obviously a matter of public concern"). Instead, the Defendants' claim that Pacheo's speech was not on a matter of public concern because it was knowingly or recklessly false.

Speech on a matter of public concern loses that status if the speech was knowingly false or in reckless disregard for the truth. *Westmoreland*, 662 F.3d at 720-21 (*citing See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007)). The "employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment." *Id*. at 721 (*quoting*

10

*Chappel v. Montgomery Cnty. Fire Prot.*, 131 F.3d 564, 576 (6th Cir. 1997).  Instead, "it is the defendants' burden to establish that [plaintiff] knew or was recklessly indifferent to the fact that his speech was false." *Id*. (alterations in original).

The Defendants argue Pacheo acted in reckless disregard of the truth.  Pacheo did not have first-hand knowledge of the alleged bomb threats.  Her efforts to corroborate the story consisted of discussing the matter with fellow teachers (who also lacked first-hand knowledge) and talking to assistant principal Butler (who confirmed the matter had been passed onto Waldrop).  Pacheo assumed the suspect student's presence in school meant the administration was not investigating the alleged bomb threats, but Defendants' argue that the more reasonable conclusion is that student's presence signified he had not engaged in wrongdoing.  Finally, the Defendants stress how easily Pacheo could have confirmed whether an investigation was ongoing by inquiring with the school administration.  (Docket #24, 31).  In contrast, Pacheo discusses the lack of communication between the administration and the teachers, the "extremely anxious" mood among teachers and students, and the grounds for her personal belief that Waldrop was not investigating the bomb threats.  (Docket #28).

While the question of whether speech involves a matter of public concern is generally a question of law, the question of whether a person spoke in knowing or reckless disregard of the truth is usually a factual issue more appropriate for a jury to decide.  *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1974);  *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004);  *Westmoreland*, 662 F.3d at 714; *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2001) ("to judge the credibility of the competing versions—that is a question for the jury").  Pacheo has shown a factual dispute that "may reasonably be resolved in favor of either party" and therefore is inappropriate to be resolved on summary judgment.  *Anderson*, 477 U.S. at 249.

11

### 3. *Pickering* balancing test.

While the Court finds Pacheo has raised a factual issue on whether she spoke with knowing or reckless disregard of the truth, the Court finds Pacheo has not established the third element of constitutionally protected speech. For the final element, the Court must decide whether Pacheo's First Amendment interests are outweighed by her employers' interest in promoting efficiency in the public services performed by RHS. *City of Elyria*, 502 F.3d at 492 (*citing Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968)); *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences").

The Sixth Circuit outlines several factors relevant to this analysis, including whether the speech: (1) relates to an issue of public concern, (2) was likely to foment controversy and disruption, (3) impeded the department's general performance and operation, (4) affected the loyalty and confidence necessary to the department's proper functioning, (5) was false and the employer could not have easily rebutted or corrected the errors, (6) was directed toward a person whom the speaker normally contacted during the course of work, and (7) was truthful. *Soloman v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988); *City of Elyria*, 502 F.3d at 493 ("the truthfulness of such statements may be relevant - *as one factor* - in striking the appropriate balance between the employee's right to free speech and the employer's interest in efficient administration") (emphasis in original).

In balancing these interests, the Court finds that Defendants' interest in promoting the efficiency of their services outweighed Pacheo's First Amendment right. For this analysis, the Court assumes that Pacheo's statements were not made with knowing or reckless disregard of the

truth and therefore related to a matter of public concern. Nor does the Court discount the seriousness of that concern – a purported attack on a school – in a community that has previously suffered a similar incident. However, every other factor weighs strongly in favor of RHS's interest in the efficient operations of the school. The letter to the editor was certain to foment controversy, as it was mailed the day after the Newtown, Connecticut school shooting (of which Pacheo was aware). (Docket #24, Ex. 2, p. 86). It did impede RHS's operations, as school was cancelled, final exams were rescheduled, and RHS had to operate on a holiday to make up for the missed day. Reidland Middle School, which was physically connected to RHS, was also closed, and in total approximately 900 students and their families were affected. (Docket #31). It also affected confidence, as the school saw a 10% drop in attendance on the first day it reopened. (Docket #31). While RHS was able to rebut the statements through a press release and an intercom address to students, doing so drew additional negative attention to the student who had been wrongfully suspected as having planned a bomb threat. (Docket #24, Ex. 4). Perhaps most importantly, the concerns Pacheo raised in the letter to the editor could have easily been dispelled by an inquiry with the school administration.[2] Finally, while truth is only one element in this analysis, Pacheo's statements were ultimately false.

With these factors in mind, the Court concludes Pacheco's First Amendment right to publicly express her concerns was outweighed by RHS's interest in promoting the efficiency of

---

[2] Pacheo claims she "had no relationship with Waldrop that would allow her to go and speak freely with the superintendent." (Docket #28). Pacheo's prior actions cast doubt on this assertion, as she had previously sent Waldrop a six-paragraph e-mail which detailed her disagreement with Waldrop's handling of a suspended student. (Docket #3, Ex. 4). The facts of this case – a suspected bomb threat and whether the students who made them were suspended – are at least as important as the issue Pacheo previously contacted Waldrop about. In any event, Pacheo as a teacher did have a working relationship with the assistant principal, the principal, and the school resources officer, all of whom could have clarified whether an investigation into the bomb threats had occurred.

the educational services provided by RHS. Accordingly, Pacheo cannot establish the first element of her First Amendment retaliation claim and the Defendants are entitled to summary judgment on this claim.

## II. Whistleblower Claim.

"The Kentucky Whistleblower Act[3] protects public employees who report perceived misconduct to certain state entities, or to 'any other appropriate body or authority.'" *Workforce Dev. Cabinet v. Gaines*, 276 S.W.3d 789, 791 (Ky. 2008). "The Act has a remedial purpose in protecting public employees who disclose wrongdoing." *Id*. "In order to prevail in a whistleblower case and survive summary judgment, [the plaintiff], under KRS 61.102, must establish four elements:

> (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure.

*Thornton v. Office of the Fayette County Atty.*, 292 S.W.3d 324, 329 (Ky. App. 2009) (*citing Davidson v. Com., Dept. of Military Affairs*, 152 S.W.3d 247, 251 (Ky. App. 2004)). At this time, the parties only dispute the third element: whether Pacheo made a good faith report to an appropriate body.

First, the Defendants contend the Paducah Sun was not "an appropriate body or authority." *Thornton*, 292 S.W.3d at 329. The phrase "any other appropriate body or authority"

---

[3] "No employer shall . . . discriminate against any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of . . . any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law . . . or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety." KRS 61.101 et seq.

14

includes any public body "with the power to remedy **or report** the perceived misconduct." (emphasis added) *Workforce*, 276 S.W.3d at 793. Neither party cites case law that specifically addresses whether a newspaper is an "appropriate body," but in *Pickering* the Supreme Court found a newspaper was an appropriate body and Kentucky courts would likely agree.

The Defendants also argue Pacheo did not make her report in good faith. "To show that good faith was used in making a report, it is incumbent upon the employee to demonstrate that the report was based on a reasonable belief of accuracy." *Thornton v. Office of the Fayette County Atty.*, 292 S.W.3d 324, 331 (Ky. App. 2009). "Further, considering the public policy purposes of the whistleblower statute, the employer must manifest some desire to correct the wrongful activity reported." *Id*.

"[A]s a general rule, a determination of whether a party acted in good faith is a question of fact that does not lend itself well to summary judgment." *Ellison v. Oldham County Sheriff's Dep't*, 2010 Ky. App. Unpub. LEXIS 336 *20 (Ky. App. 2010) (unpublished); *see also Grise v. Christian County Fiscal Court*, 2010 U.S. Dist. LEXIS 66198 *15-16 (W.D. Ky. 2010); *Ross v. Univ. of Ky.*, 2014 Ky. App. Unpub. LEXIS 3 *20 (Ky. App. 2014) (unpublished).

The Court finds that similar to how there are unresolved issues of fact regarding whether Pacheo spoke in reckless disregard of the truth, there are unresolved issues of fact regarding whether Pacheo made her report in good faith. Accordingly, this issue is inappropriate to be decided on summary judgment.

### III.    Claims against the Defendants in their individual capacities.

Finally, the Defendants seek summary judgment to the extent Pacheo asserts claims against the Defendants in their individual capacities. The Court has found that Pacheo did not

establish the elements of a First Amendment claim, and this claim is dismissed in its entirety. While there remain unresolved factual issues regarding Pacheo's Whistleblower claims, these claims can only be asserted against the Defendants in their official capacity. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 897 (6th Cir. 2006); *Cabinet for Families & Children v. Cummings*, 163 S.W.3d 425, 431-434 (Ky. 2005) ("the language of KRS 61.101(2) does not impose individual civil liability under Kentucky's Whistleblower Act for reprisal against public employees of the Commonwealth and its political subdivisions."). Therefore, to the extent Pacheo's Whistleblower claims are against the Defendants in their individual capacity, the Defendants are entitled to summary judgment in their favor.

## CONCLUSION

Pacheo has not shown she engaged in constitutionally protected speech because her First Amendment right was outweighed by the RHS's interest in efficiently operating the school. Pacheo has raised a factual issue regarding whether she acted in good faith, and therefore her Whistleblower claims survive summary judgment. To the extent Pacheo's Whistleblower claims are against the Defendants in their individual capacities, the Defendants are entitled to summary judgment.

IT IS HEREBY ORDERED that the Defendants' motion for summary judgment (Docket #24) is GRANTED IN PART and DENIED IN PART.